UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**JAN CAREY,**<br><br>**Defendant.** | **Case No. 1:25-cr-00251-JEB** |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO THE MOTION TO DISMISS BOTH COUNTS IN THE INFORMATION PURSUANT TO FED. R. CRIM. P. 12(b)**

Mr. Carey has carried his burden to justify the dismissal of the Information. The Government's arguments in opposition are without merit and the charges against Mr. Carey should be dismissed. Further, the government does not oppose Mr. Carey's argument that the rule of lenity should apply.

I.     **Argument**

A.     **The Government's Straw Man Argument About Selective Prosecution**

The Government's lead and presumably strongest argument in opposition is a "straw man" argument in opposition to a selective prosecution defense. Gov't's Opp. at 8-9 (ECF No. 15). However, Mr. Carey does not present a selective prosecution defense. *See* Def.'s Mot to Dismiss at 1 (ECF No. 12). Mr. Carey contends, among other things: 1, that the general wilderness regulations have been supplanted within the National Capital Area solely in the limited context of expressive or demonstration activity, as is substantially or comprehensively regulated at 36 C.F.R. § 7.96(g), and alternatively that the regulations are ambiguous and vague and must be interpreted in favor of Defendant under the rule of lenity and the doctrine of constitutional avoidance; and 2, that the Government's prosecution is vindictive, conducted pursuant to Presidential directive targeting certain expressive conduct which the

1

President deems offensive, specifically, flag-burning.

> **A. The Special Regulatory Provisions Governing Demonstrations and Expressive Activities (36 C.F.R. § 7.96) Supplant the General Wilderness Regulations Regarding the Subject Matter Regulated by those Special Regulations, i.e. Demonstrations and Expressive Activities in Specified Parks Including Lafayette Park**
>
> **1. The Government Overstates Mr. Carey's Position**

The Government argues, with another "straw man" presentation, that "[i]f the specific regulations supplanted the authority of the general regulations, it would render the general regulations superfluous." Gov't's Opp. at 12 (ECF No. 15). Mr. Carey, however, argued on opening motion that the special regulation "supplants the general wilderness regulations regarding the subject matter encompassed." Def.'s Mot to Dismiss at 7 (ECF No. 12) (referencing the specific demonstration regulations that comprehensively regulate demonstration and expressive activities in light of the "unique nature" of Lafayette Park); *id.* at 8 (arguing that the general wilderness regulations "are inapplicable to use of fire for expressive or demonstration activity within Lafayette Park"). Mr. Carey's position does not extend beyond the limited scope of demonstration and expressive activities in these limited and unique venues.

To make its argument, the Government omits entirely the context of this matter, that the governing regulations involve expressive activity and that Mr. Carey was engaged in expressive activity. The Government analogizes to coral reef regulations and scenic trail regulations operating as special regulations to supplant wilderness regulations only based on the wildlife, flora and fauna needs of unique environments but evades the main point entirely, which is that the governing regulations at issue here govern expressive activity in this preeminent location at the site of government: the park in front of the White House.  Mr. Carey engaged in expressive conduct which is governed by 36 C.F.R. 7.96.

Unacknowledged by the Government is Mr. Carey's citation to the Secretary of Interior's accompanying statement upon issuance of these regulations expressly acknowledging the continued and permitted use of fire for expressive or demonstration purposes near the White House. Def.'s Mot to Dismiss at 7 – 8 (ECF No. 12) (citing 47 Fed. Reg. 24302, 24303 (June 4, 1982)) (Secretary referenced with favor the continued permission for "building of fire" for expressive activities proximate to the

White House). No argument is presented that runs the risk of "render[ing] the general regulations superfluous." Gov't's Opp. at 12 (ECF No. 15).

The Government makes certain important admissions.

- The Government admits that the special regulations at 36 C.F.R. § 7.96(g) may amend, modify, modify, or relax the general wilderness regulations in Part II. Gov't's Opp. at 15 (ECF No. 15).
- Section 7.96 explicitly restricts and regulates use of fire for demonstration or expressive purposes. Gov't's Opp. at 15 (ECF No. 15) ("A plain reading of Section 7.96 in fact imposes added restrictions on making a fire within the National Capital Region.") (citing 7.96 C.F.R. § 7.96(g)(5)(vi)).
- Section 7.96 does not impose regulations on fires in connection with demonstration or expressive activity except to the extent that it prohibits use of fire in connection with demonstration activities where actors are doing so "as a living accommodation." Gov't's Opp. at 14 (ECF No. 15) ("Section 7.96 imposes no regulations on fires [for demonstration or expressive activities] outside of the camping context").
- The Department retains the discretionary authority to impose specific restrictions on fire where the National Park Service issues an advance written permit pursuant to 36 C.F.R. § 7.96. *See* Gov't's Opp. at 14 (ECF No. 15) (referencing exemplar of permit issued under § 7.96 with such additional caveats); *See also* D.E. 12-3 (National Park Service permit which restricts or outlines use of fire under Section 7.96 does so with no reference to nor reliance whatsoever on § 2.13).[1]
- No advanced written permit was necessary for Mr. Carey's demonstration and expressive conduct. Gov't's Opp. at 14 n.4 (ECF No. 15) ("The United States does not argue that a permit was required for the Defendant's demonstration").

In argument, the Government contends that a "plain reading" and the "structure" of the

---

[1] The assertion by the Government that this permit "included the general regulations under Section 2.13" is an atextual reference. Gov't's Opp. at 15 (ECF No. 15). The permit contains no citation to this Section.

3

regulatory framework suggests that § 2.13 regulates demonstration and expressive activity, including with respect to fire used in connection with demonstration activity, Gov't's Opp. at 12 (ECF No. 15), but that is simply not the case as Mr. Carey has presented on opening motion and herein.

The Government then argues that "[a] ruling otherwise would lead to conduct that would result in hazards to public safety, for which the Government has a compelling interest in regulating." Gov't's Opp. at 12 (ECF No. 15). This is an argument that the Government could invoke to justify hypothetical regulations, were such regulations promulgated, that more broadly restricted or outlined use of fire in connection with demonstration activity than do the existing version of the regulations. It is not a persuasive argument that the Court should let the Government charge criminal offenses for expressive conduct in connection with demonstration activity in Lafayette Park that does not exist within the current regulatory framework.

The generally applicable fire regulations in § 2.13 have not been crafted with National Capital Region visitors' unique First Amendment considerations in mind, and as such are incompatible with the robust regulatory scheme governing expressive conduct that is contained in § 7.96.

Mr. Carey does not argue that individuals are free to "use . . . fires in any manner without regard to public safety . . . in the National Capital Region." Gov't's Opp. at 13 (ECF No. 15). Mr. Carey's position is that the § 2.13 regulations under which he is being prosecuted are inapplicable to his flag burning expressive conduct in Lafayette Park. It cannot, however, advance a criminal prosecution under the federal regulations as it seeks to do herein relating to demonstration activity use of fire, where such is not proscribed.

Further, the Government has made no attempt to respond to Mr. Carey's additional argument that the rule of lenity requires any regulatory ambiguity to be resolved in Mr. Carey's favor. Consequently, the Government has waived and forfeited this argument in opposition and has conceded this argument. *See United States v. Pole,* No. 09-cr-354, 2021 U.S. Dist. LEXIS 234355, at *16 (D.D.C. Dec. 7, 2021) ("Here, the government has forfeited its forfeiture argument by not raising it in its opposition to [Defendant's] motion for a new trial."); *United States v. Nelson*, 59 F.Supp.3d 15, 25 (D.D.C. 2014) ("The government did not analyze the facts under that standard, or even mention the guilty plea standard

in its 'Argument' section. Accordingly, the government has waived its argument that Nelson's claim should be assessed under *Brady v. United States* rather than *Brady v. Maryland*." (internal citations omitted)).

### 2. The Public Gathering Permit Referenced in Mr. Carey's Motion to Dismiss Illustrates That Section 2.13 Does Not Apply and That Flag Burning is Regulated Under the Section 7.96 Regulatory Scheme.

The Government asserts that the Public Gathering Permit included as Exhibit E to Mr. Carey's Motion to Dismiss is evidence that § 2.13 governs expressive use of fire in National Capital Region parks. Gov't's Opp. at 14-16 (ECF No. 15). On the contrary, the Public Gathering Permit makes clear that demonstration activity, including flag burning, is regulated under § 7.96.

The Government concedes that the Public Gathering Permit itself makes no explicit reference to § 2.13. Gov't's Opp. at 14 (ECF No. 15). Instead, the Government argues that § 2.13's applicability must be inferred from the permit's authorization of safety items such as fire extinguishers and its statement that "[c]ombustible or flammable liquids or other hazardous materials, shall not be used to aid the ignition of the flag." Gov't's Opp. at 14 (ECF No. 15). The Government contends that Mr. Carey also needed to abide by these implied requirements, even though it also acknowledges that his demonstration required no permit at all. Gov't's Opp. at 14 n.4 (ECF No. 15). The Government asserts that unpermitted demonstrations must comply with "other conditions required for the issuance of a permit." Gov't's Opp. at 14 (ECF No. 15). According to the Government, § 2.13 is one such condition, though it is not stated anywhere as a condition. Gov't's Opp. at 14 (ECF No. 15). There is no basis for this argument.

The plain language of § 7.96 states that "[d]emonstrations involving 25 persons or fewer may be held without a permit *provided* that the other *conditions required for the issuance of a permit* are met." 36 C.F.R. § 7.96(g)(2)(i) (second emphasis added). The portions of § 7.96 that lay out the conditions required for the issuance of a permit are extensive and detailed. They lay out the procedures by which a permit may be secured, *id.* § 7.96(g)(3), indicate areas where a demonstration may never be held, *id.* § 7.96(g)(3)(i), (ii), and impose caps on the number of participants for any single demonstration, *id.* § 7.96(g)(5)(i), (ii), among many other things. Critically the regulations address additional restrictions to be imposed on persons assembling in the absence of a written permit. § 7.96(g)(5)(vi)(E) further details

5

that persons engaged in expressive activity without a permit under the "25 or less" rule shall limit structures to small lecterns and speakers platforms. The Government has identified no provision in § 7.96 that incorporates § 2.13 into the "conditions required for the issuance of a permit" or states that demonstrators—permitted or otherwise—must follow any of the procedures that the Government asserts are required.

The requirements imposed in the identified Public Gathering Permit were created and agreed to in the permitting discussions for that event. If the National Parks Service wanted to impose specific requirements on all demonstration activity involving fire, it knew how to do so. *See, e.g.*, § 7.96(g)(5)(vii)(B)(2) (specifying the size signs in Lafayette Park that are not being hand-carried may be, down to the quarter inch). There are likewise no specific requirements regarding demonstration vigils with open flames, though those occur regularly.

Even if the Government's reading of § 7.96(g)(2)(i) is correct, that would only cause the regulation to run afoul of both the Due Process Clause and the Administrative Procedure Act. As explained above, § 7.96 does not explicitly state that § 2.13 applies to permitted or un-permitted demonstration activities, nor does it specify what precautionary measures a demonstrator must take when making expressive use of fire. Read the Government's way, the regulation is "vague" and "susceptibl[e] to arbitrary enforcement." *See Planned Parenthood of Greater N.Y. v. United States HHS*, No. 25-cv-2453, 2025 U.S. Dist. LEXIS 198488, at *62 (D.D.C. Oct. 7, 2025). "An agency's requirements must be comprehensible and give entities fair notice of what is required of them." *Id.* at *70; *see also Gen. Elec. Co. v. EPA*, 54 F.3d 1324, 1329 (D.C. Cir. 1995) ("[A]s long ago as 1968, we recognized this 'fair notice' requirement in the civil administrative context."). A regulated party "must be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform." *Nissan Chem. Corp. v. FDA*, 744 F.Supp.3d 1, 9 (D.D.C. 2024) (quoting *Gen. Elec. Co.*, 53 F.3d at 1329).

The Government's argument, at its best, only serves to support Mr. Carey's argument as to ambiguity, vagueness, and the rule of lenity. There are no standards laid out in the permitting process from which Mr. Carey could have divined the requirements that were imposed in the Public Gathering

Permit. And, as the Government would have it, that failure to predict whatever safety mechanisms the National Park Service has incorporated into other permits (but not the operative regulations) is grounds for prosecution. But this fails to provide entities with fair notice of what is required of them. Such "[v]ague agency action . . . invites unreasoned, discriminatory enforcement" and "is arbitrary and capricious." *Planned Parenthood of Greater N.Y.*, 2025 U.S. Dist. LEXIS 198488, at *70.

For these reasons, the Government's argument as to the interpretation of § 2.13 and § 7.96 should be rejected.

### B. Defendant is Being Prosecuted as Punishment for his First Amendment Protected Speech

#### 1. Prosecutors' Broad Discretion and the "Presumption of Regularity" do not immunize the Government's attempts to punish speech from review.

"There is no doubt that the breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse. And broad though that discretion may be, there are undoubtedly constitutional limits upon its exercise." *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978). Prosecutors enjoy this discretion because they are the "President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting U.S. Const., Art. II, § 3). A "presumption of regularity" follows from this discretion granted to prosecutors in their capacity as extensions of the President's law enforcement duties. *Id.* The Government cannot take refuge behind the discretion granted to prosecutors by virtue of being the "President's delegates" when that President has, via Executive Order and his own public speech, commanded them to use criminal prosecutions to punish the exercise of the constitutional right to burn the American flag.

Further, the District Court for the District of Columbia recently noted that the presumption of regularity "has become a frequent subject of litigation since January 20, 2025, the advent of the second Trump Administration." *Fed. Educ. Ass'n v. Trump*, No. 25-cv-1362, 2025 U.S. Dist. LEXIS 157767, at *24 (D.D.C. Aug. 14, 2025). "Generations of presidential administrations and public officials have validated this underlying premise of the presumption of regularity . . . . Over the last six months, however, courts have seen instance after instance of departures from this tradition." *Id.* at *25 (citing

7

over 20 such departures). "In just six months, the President of the United States may have forfeited the right to such a presumption of regularity." *Id.* at *29; *see also* Audrey Balliette, et. al, *The "Presumption of Regularity" in Trump Administration Litigation*, Just Security (November 20, 2025), https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation/#Toc214438801 [https://perma.cc/WYK4-F26X] (documenting over 150 instances of conduct by the Department of Justice directly addressed by courts as undermining the presumption of regularity, a survey that explicitly did not attempt to cover prosecutorial decisions).

### 2. Mr. Carey has presented objective evidence indicating actual vindictiveness designed to punish him for his speech.

The Government argues repeatedly that Mr. Carey has not identified objective evidence that the "prosecution is designed to punish *this* particular Defendant for asserting his legal rights." Gov't's Opp. at 17 (ECF No. 15) (citing *Maddox v. Elzie*, 238 F.3d 427, 446 (D.C. Cir. 2001)).[2] The Government twice emphasizes the phrase "this *particular* defendant" as a showing the Defense has failed to make. This misstates the reference point for the necessary animus, suggesting that the only animus that forms the basis of vindictive prosecution is one that targets on the basis of identity, as if the President had to focus his directive of prosecution against Mr. Carey by name. Here, Mr. Carey was targeted based on his expressive conduct, which the President has targeted as seriously offensive to his political viewpoint. The issue, properly framed, is whether the prosecutorial action is designed to "penalize a defendant for invoking legally protected rights." *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987) *reh'g granted and opinion vacated*, 816 F.2d 695 (D.C. Cir. 1987), *reh'g denied and opinion reinstated*, 824 F.2d 1240 (D.C. Cir. 1987). Here, Mr. Carey was targeted for his expressive conduct, specifically burning an American flag.

The Government does, however, agree that a defendant can show "actual vindictiveness" by

---

[2] There is nothing in the Government's cited case (*Maddox v. Elzie*, 238 F.3d 437, 446 (2001)) that explains what the Government might mean by "*this* particular defendant," and the Government makes no attempt to explain.

presenting "objective evidence" that the prosecution was designed to target an individual for asserting his legal rights. Gov't's Opp. at 9 (ECF No. 15).

The Government minimizes the evidence of actual vindictiveness by describing the evidence referenced by Mr. Carey as mere "alleged social media posts from the President and audio from body worn camera footage from officers on scene at the time of the incident." Gov't's Opp. at 17 (ECF No. 15). The Government disregards the text of Executive Order 14341, the Fact Sheet accompanying the issuance of the Executive Order, and the statements of the President, all of which are evidence of Government intent and animus – specifically identifying the First Amendment expressive act of flag burning and directing its prosecution. This Court has considered both Executive Orders and fact sheets issued alongside those Orders as evidence of the intent of Government action. *Am. Foreign Serv. Ass'n v. Trump*, 783 F. Supp. 3d 248, 264 (D.D.C. 2025); *see also AFL-CIO v. Trump,* No. 25-cv-2445, 2025 U.S. Dist. LEXIS 154587, at *9 (D.D.C. Aug. 11, 2025); *see also Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 254 (D.D.C. 2025). Statements by the President, including Truth Social posts, are evidence of Government animus. *See Perkins Coie LLP v. United States DOJ,* 783 F. Supp. 3d 105, 158 (D.D.C. 2025) (President's posts on Truth Social constitute evidence of animus); *President & Fellows of Harvard Coll. v. United States Dep't of Homeland Sec.*, 788 F. Supp. 3d 182, 204 (D. Mass. 2025) (President's Truth Social posts are evidence of retaliatory intent targeting protected speech).

In its Opposition, the Government advances four arguments as to why the Defense has not shown objective evidence indicating actual vindictiveness. Gov't's Opp. at 17-19 (ECF No. 15). We address those in order.

As outlined in Mr. Carey's Motion to Dismiss, the Executive Order, its accompanying Fact Sheet, the President's own words (both written online and spoken), and the words of arresting Officers Enrique Wong and Francisco Pacheco indicate the protected expressive conduct of burning the flag is the motivation for this prosecution. Specifically, EO 14341 reads "My Administration will act to restore respect and sanctity to the American Flag and prosecute those who incite violence **or otherwise violate our laws while desecrating this symbol of our country, to the fullest extent permissible under any available authority.**" Exec. Order No. 14,341 90 Fed. Reg 42,127 (emphasis added). The Government

9

claims Mr. Carey is being prosecuted only for violations of these park regulations, but the park regulations are part of "any available authority" that the President ordered the Government to use to prosecute individuals like Mr. Carey for their speech.

Second, the Government argues "The President's social media accounts do not dictate the independent and discretionary decisions of federal prosecutors any more than comments from law enforcement captured on body worn camera do as they determine what action to take in response to criminal activity." Gov't's Opp. at 19 (ECF No. 15). But Defense's argument is not that individual prosecutors are directly taking instructions from the President's Truth Social posts, but that the President's Executive Order commanded, and his spoken and written words endorsed, this exact type of prosecution should anyone dare to exercise their constitutionally protected right to burn a flag. And his spoken and written words are objective evidence of vindictive prosecution. The Government contends that the President's own Executive Order directed at the Department of Justice cannot be considered as influences upon U.S. Attorneys and the words of the President explaining the intended effects ("we took the freedom speech away"[3]) of that order cannot be considered as influences or motivations on the actions of prosecutors. Assistant United States Attorneys are not hermetically sealed in a bubble of pure legal analysis, unperturbed by the motivations and actions of other agencies, their superiors, or the Executive from whom their discretion and presumption of regularity flows. Recent reporting based on interviews with over 60 former Department of Justice paints a picture of a department where "Trump and his appointees have blasted through the walls designed to protect the nation's most powerful law enforcement agency from political influence; they have directed the course of criminal investigations, openly flouted ethics rules and caused a breakdown of institutional culture." Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html [https://perma.cc/BN5S-MPDP].

The "presumption of regularity" is that when the U.S. President orders federal prosecutors to

---

[3] BrieAnna J. Frank, *Trump says he 'took the freedom of speech away' on flag burning*, USA Today (Oct. 8, 2025, 9:32 PM), https://www.usatoday.com/story/news/nation/2025/10/08/trump-flag-burning-first-amendment-portland-free-speech/86589856007/ [https://perma.cc/TW8H-E32Q].

target and prosecute flag burning, they will execute this directive. As occurred in this case.

The purpose of the vindictive prosecution doctrine is to protect individuals' due process rights from being violated, not to protect individuals from specific prosecutors. The concern is not "whether a prosecutor has acted maliciously or in bad faith, but whether a prosecutor's actions are designed to punish a defendant for asserting her legal rights." *United States v. Gary*, 291 F.3d 30, 35 (D.C. Cir. 2002) Vindictive prosecution analysis focuses "on the conduct of the government as a whole rather than on the conduct or retributive sentiments of a single prosecutor." *Meyer,* 810 F.2d at 1248; *accord Thigpen v. Roberts*, 468 U.S. 27, 82 (1984) ("The presumption [of unconstitutional vindictiveness] does not hinge on the continued involvement of a particular individual."). That the individual prosecutors claim probable cause is not a legal bar to a vindictive prosecution claim. As the United States District Court for the Middle District of Tennessee recently held in ordering discovery for another vindictive prosecution claim against the current incarnation of the Department of Justice, "[t]he motivations of the people who place the file on the prosecutor's desk are highly relevant when considering a motion to dismiss for vindictive prosecution." *United States v. Garcia*, No. 25-cr-00115, 2025 U.S. Dist. LEXIS 213551, at *3 (M.D. Tenn. Oct. 27, 2025).

Third, the Government contends that there is no allegation in the Information that specifies burning the flag and that Mr. Carey was not charged with incitement or fighting words, which it identifies as two suggested methods of prosecution in the Executive Order. The Government's argument seems to be that vindictive prosecution might be demonstrated by inclusion of these specific references from the Executive Order. Gov't's Opp. at 18 (ECF No. 15). But the Executive Order explicitly ordered prosecutors to use unrelated laws to punish the burning of the flag. The Order *commands* the usage of charges whose language would not relate to the burning of the flag. Section 1: "My Administration will act to restore respect and sanctity to the American Flag and prosecute those who incite violence **or otherwise violate our laws while desecrating this symbol of our country, to the fullest extent possible.**" Exec. Order No. 14,341 90 Fed. Reg 42,127 (emphasis added). Section 2(c): "To the maximum extent permitted by the Constitution, the Attorney General shall vigorously prosecute those who violate our laws in ways that involve desecrating the American flag[.]" *Id.* The accompanying Fact

11

Sheet states that the Government shall "prosecute those who desecrate this symbol of our freedom, identity, and strength to the fullest extent permissible." The White House, Fact Sheet: President Donald J. Trump Protects the American Flag from Desecration, Aug. 25, 2025, https://www.whitehouse.gov/fact-sheets/2025/08/fact-sheet-president-donald-j-trump-protects-the-american-flag-from-desecration/ [https://perma.cc/Z5EZ-32MD]. The Executive Order also mentions multiple potential mechanisms, including "open burning restrictions," and not as a matter of limitation. The entire explicit point of the Executive Order – including in its title – is to direct prosecutors to punish flag burning because the expressive conduct is deemed disfavored.

The Government's Fourth argument seems to be circular. It argues that it would have charged others for the same conduct under the wilderness regulations. It evades the argument as to the inapplicability of Section 2.13 to demonstration-related activity in Lafayette Park.

### 3. Mr. Carey has made a colorable showing of discriminatory effect and purpose and has therefore met the bar for discovery on the vindictive prosecution claim.

To obtain discovery on a vindictive prosecution claim, the Defense must "provide some evidence tending to show the existence of a discriminatory purpose and a discriminatory effect." *United States v. Gonzalez*, 507 F. Supp. 3d 137, 175 (D.D.C. 2020) (citing *Armstrong*, 517 U.S. at 462-63). This standard has been met.

The government argues that Mr. Carey has not shown that others "similarly situated" to him have not been prosecuted for similar expressive conduct, and therefore fails to meet the *Armstrong* standard for obtaining discovery. Gov't's Opp. at 20 (ECF No. 15). This is an inappropriate incorporation of the elements for a selective prosecution defense into a vindicative prosecution defense.

The court in *Gonzalez* applied the standard for obtaining discovery in a selective prosecution claim to a vindictive prosecution claim. That standard is: a defendant must "provide some evidence tending to show the existence of prosecutorial vindictiveness." *United States v. Bucci*, 582 F. 3d 108, 113 (1st Cir. 2009). It is not "point to someone similarly situated who was not prosecuted," as the Government suggests. The defense has provided ample evidence tending to show the existence of

prosecutorial vindictiveness.

## II. Conclusion

For reasons stated in the opening motion and herein, the Information should be dismissed.

In the alternative, the Court should grant further discovery into the vindictive prosecution claim.

Dated: November 24, 2025

                                              Respectfully Submitted,

                                              *s/ Nick Place*
                                              Nick Place (Bar #LA0021)
                                              nick.place@justiceonline.org
                                              Partnership for Civil Justice Fund
                                              617 Florida Ave NW
                                              Washington, DC 20001
                                              (202) 220-8750

                                              *s/ Mara Verheyden-Hilliard*
                                              Mara Verheyden-Hilliard (Bar # 450031)
                                              mvh@justiceonline.org
                                              Partnership for Civil Justice Fund
                                              617 Florida Ave NW
                                              Washington, DC 20001
                                              (202) 919-4440

                                              *Counsel for Defendant*